[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDINGS:
Christopher C. is a child of three years of age, with a date of birth of December 21, 1987. The child was previously adjudicated to be uncared for and was committed to the custody of the Commissioner of the Department of Children and Youth Services ("DCYS") for a period not to exceed eighteen months on July 6, 1988. That commitment was extended by the court for an additional period not to exceed eighteen months on January 6, 1990.
On November 28, 1989 the Commissioner filed a petition to terminate the parental rights of both the mother, Dorothy C., and the putative fathers, Danny C. and Bruce P. The petition was last amended with the permission of the court on December 14, 1990. CT Page 1722
A trial on the termination petition was held on January 4, 1990. The respondent mother and her attorney were present. However, neither putative father was present, and since neither has ever responded or appeared, neither was represented by counsel.
FACTS
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children of which the court has taken judicial notice, permits the finding of the following facts:
Christopher was adjudicated to be uncared for, in that he was homeless, on July 6, 1988, and at age six months he was committed to DCYS. Christopher was originally placed with his mother in a residence in Brooklyn Connecticut. However, in October, 1988 he was placed in a foster home in New London so he could be close to mother who was then living in New London area and attending a computer processing school through the efforts of DCYS. Christopher has remained in foster care ever since.
Shortly before Christmas, 1988, mother left the computer school program and moved to New York City where she remained until August, 1989. During that eight month period Dorothy had no contact at all with Christopher, she did not maintain contact with DCYS nor advise them of her whereabouts, and she had no contact with the child's foster mother.
Dorothy returned to Connecticut in August, 1989 but waited for three months before seeking to see Christopher. She contacted DCYS in November, 1989 and requested a visit, which was arranged. Mother had two visits with Christopher in November or December, 1989. She did not remember him for Christmas or his third birthday in December, 1989.
Dorothy's testimony as to the reason she did not visit, call or write Christopher during the eight months she was in New York, and for the three months after she returned to Connecticut, was because she did not have a suitable place to live and she was trying to get herself together. (Testimony of mother and Dr. Mantell and Exhibit #1). The court finds her explanation/excuse totally unreasonable and unacceptable.
Christopher was moved to a new foster home in Jewett City, Connecticut on January 5, 1990 because his initial foster mother moved to Florida. Mother, who was living in Willimantic, gave birth to a second child, Charles, in January 1990.
Mother next saw Christopher on February 20, 1990 and again on CT Page 1723 March 19, 1990 during court ordered evaluations with Dr. David Mantell. Except for those two visits, mother made no effort to visit with Christopher, nor did she seek to visit with him, until May, 1990.
On May 23, 1990, mother entered into a service agreement with DCYS in which she agreed to attend therapy at least once per week and visit with Christopher at least once per week. In fact, she has only seen the child four times since entering into the service agreement.
Mother entered into therapy with United Services in Willimantic in May, 1990 but voluntarily terminated her participation in late August, 1990. Additionally, both mother and child were involved in a combination evaluation and controlled visiting program at United Services from May through August, 1990. Mother attended six of the nine sessions. (Exhibit #6). Christopher was present at and visited with mother during four of those sessions. The last session with United Services was on August 28, 1990. Dorothy has not seen Christopher since that date.
The court finds that mother has seen her son approximately eight times during the past two years between December, 1988 and January 4, 1991, the date of trial.
The United Services Young Parents Program began offering services to Dorothy in May 1990, in an effort to assist her to develop parenting skills with her infant child, Charles. Ms. Prugh reported that over a three month period of intensive effort by that group mother made no progress at all. In addition, the Young Parents Program has consistently offered to provide transportation for Dorothy to permit her to visit with Christopher in Jewett City. (Testimony of respondent mother). Dorothy testified that she has never taken advantage of their offer and has never visited with Christopher at the foster home in Jewett City. She gave no explanation why she did not use the Young Parent transportation resource other than to state that she simply did not take advantage of this service.
Mr. Hilliard testified that he has been in contact with mother at least monthly since she re-established contact with the agency in November, 1989. He has encouraged her to visit with Christopher and to keep in contact with the child by telephone.
In May, 1990, mother requested transportation assistance from DCYS in order to visit with Christopher. Both Dorothy and Gary Hilliard of DCYS testified that mother was provided with information and advice concerning the bus schedule for getting to Jewett City from Willimantic. While the route is circuitous and time consuming, the trip is certainly possible, especially for someone who used the CT Page 1724 in New York City transportation system for eight months. However, mother never used this means of transportation to visit Christopher at his foster home. While DCYS did not offer to reimburse mother for transportation costs, there is no evidence that she ever requested or needed such reimbursement.
Mother testified that since May, 1990 she has been calling the foster mother at least once per week. Gary Hilliard testified that the foster mother reported to him that mother called the foster home only once or twice since August, 1990. The court finds Mr. Hilliard's testimony to be more credible as to this issue.
In October, 1990 mother and her live-in boyfriend, were arrested on narcotic charges. Those cases are still pending. Additionally, mother and her boyfriend have been involved in at least two incidents of domestic violence, one of which resulted in mother stabbing the boyfriend.
CLINICAL EVALUATIONS:
Dr. David Mantell, a licensed clinical psychologist, conducted a court ordered evaluation of mother and child beginning on February 20, 1990 and concluding on March 19, 1990. Dr. Mantell found no evidence of a parent child relationship in existence during the two days over which he conducted his evaluations. In addition, mother was observed to be immature and lacked judgement in relating to the child. He also found the child to be almost mute and quite passive with respect to mother during the evaluations. This, he testified was contrary to the behavior of the child reported by the foster mother. The child related better to the evaluator than to his own mother. According to Dr. Mantell, the child was very affectionate toward his foster mother and is bonded to her. He testified that Mother told him that her decision not to visit with Christopher was voluntary on her part.
Dr. Mantell indicated that Dorothy does have the ability to maintain interest in the child and that she would be capable of parenting the child if she was motivated to do so. However, he stated that in his opinion she is not motivated to parent the child. "I don't think she is interested in the child". (Testimony of Dr. Mantell).
Dr. Mantell stated that removal of the child from his foster mother, to whom he is strongly bonded, would be traumatic for the child and harmful to him. He most certainly would suffer regression.
A second evaluation of mother and child was conducted by Joan Prugh of the United Services Parent-Child Resource Center, over a three month period, from May 25 through August 28, 1990. Ms. Prugh has both a Master of Social Work degree and nine years of clinical CT Page 1725 experience in dealing with parents and children. Her observations and findings complemented those of Dr. Mantell.
No evidence of a parent-child relationship was observed during the first session on May 25, 1990. Indeed, no evidence of a parent-child relationship was observed during any of the sessions. For example, during the first visit mother did not greet Christopher, nor did she make eye contact with him. Christopher sat frozen during the entire time. Dorothy did not even say good-bye to him at the end of the initial session until encouraged to do so.
Ms. Prugh found Christopher to be developmentally delayed with a high level of anxiety. The only time Christopher spoke while his mother was present was on one occasion when he answered mother's question in a whisper, only to be rebuked by mother who corrected his response. In contrast, the child spoke spontaneously and clearly to his foster mother.
While mother tried to engage the child she was not at all successful. The following portion of Ms. Prugh's report is illustrative of that point. (Exhibit #6)
 "Dorothy related to Christopher in a demanding and intrusive manner. Her own dependency needs are intense. Her style of interaction was to order Christopher to play with toys in a way that pleased Dorothy. She appeared easily irritated when Christopher did not comply with her demands. . . . My conclusion is that Dorothy is incapable of commitment to Christopher."
Ms. Prugh testified that mother made no progress at all in developing a relationship with Christopher during the time she worked with United Services.
The court finds the observations and opinions contained in the testimony and reports of Dr. Mantell and Ms. Prugh to be credible and has afforded great weight to this evidence. "Psychological testimony is rightly accorded great weight in termination proceedings." In re Juvenile Appeal (anonymous), 177 Conn. 648, 667
(1979); In re Nicolina T., 9 Conn. App. 598, 605 (1987). Specifically, the court finds that the child has no positive feelings for or positive emotional ties with his mother.
Gary Hilliard of DCYS testified that neither putative father has ever visited with Christopher, communicated with DCYS, or been in contact with the child's foster parents. He testified that Christopher is adoptable and that the current foster parents have expressed an interest in adopting the child.
ADJUDICATION — on facts as of December 14, 1990. CT Page 1726
The petition, as amended, cites the following grounds for termination as to each of the three respondents: (1) abandonment; (2) failure to rehabilitate; and, (3) no ongoing parent/child relationship. It is further alleged that all three grounds have existed for more than one year.
ABANDONMENT:
The Connecticut General Statutes sections 17-43a(b)(1) defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred." In Re Rayna N., 13 Conn. App. 23, (1987).
The evidence is both clear and convincing that neither the mother nor either putative father has maintained a reasonable degree of interest, concern or responsibility as to the welfare of the child.
The putative fathers have never visited with the child nor ever expressed any interest in or concern for his welfare or well being. Mother has had little or no interaction with Christopher during the period of his commitment. She had no contact with the child, or DCYS, from December 1988 until August, 1989 when she moved to New York, and even after returning to Connecticut she did not contact the child or his caregivers for several months. In fact, since returning to Connecticut mother's visits with the child have been sporadic, at best. She complained that she had transportation difficulties in visiting with Christopher but she did not take advantage of the transportation opportunities offered to her by the United Services Young Parents program so she could visit more easily and frequently with Christopher. That can hardly be considered as maintaining a reasonable degree of interest in the child.
The court finds that the evidence has clearly and convincingly proven the ground of abandonment as to all three respondents, and further finds that this condition has existed for more than one year.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
 ". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and CT Page 1727 educational needs of the child[ren] and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child[ren]."
It is clear that there is no ongoing parent child relationship in effect between Christopher and any of the respondents. The court accepts the testimony, reports, observations and expert opinions of the clinical evaluators in this case that no such relationship exists between mother and child. The child has no positive emotional feelings for or ties with the respondents. The court finds that whatever relationship exists between Dorothy and Christopher it is not the type of relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child. Dorothy has not met those needs of Christopher for more than one year. The fact that there has been some contact between mother and this child subsequent to his commitment in July, 1988 until the time of trial . . . "does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year". In re Juvenile Appeal, (Anonymous), 181 Conn. 638, 646 (1980).
Clearly no such relationship exists between the child and his putative fathers as neither father is nor has been a part of Christopher's life since his commitment in 1988.
Even though no parent-child relationship exists, that alone is not grounds to terminate a parent's rights. The court must also find by clear and convincing proof that to permit further time to establish such relationship would be detrimental to the best interest of the child.
The respondent mother's lack of interest in and concern for Christopher since December, 1988 is clearly predictive of her future lack of interest in and commitment to the child. Both Dr. Mantell and Ms. Prugh are of the opinion that mother is not interested in nor committed to caring for Christopher. There is no indication or even suggestion that either putative father will ever establish a relationship with the child.
Christopher had been in placement for over two years. He needs a permanent, nurturing and secure home and caregivers. It is clear that he is not going to receive that care and permanency from the respondents now or in the foreseeable future, and that to require him to wait any longer for permanency would be detrimental to his best interest. The court accepts Dr. Mantell's opinion that removal of the child from his foster mother, to whom is strongly bonded, would be traumatic and harmful to the child and cause him to regress. CT Page 1728
The court finds that the petitioner has proven this ground for terminating the parental rights of all three respondents by clear and convincing evidence, and further finds that this condition has existed for more than one year.
FAILURE TO REHABILITATE:
Section 17-43a(b)(2) of the General Statutes provides for the termination of parental rights in the situation where a parent of a child who has previously been adjudicated as being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time said parent could assume a responsible position in the life of the child, considering the age an the needs of said child. The court finds that Christopher was adjudicated to be uncared for and has been committed to the custody of the Commissioner of the Department of Children and Youth Services since July 6, 1988.
"`Personal rehabilitation' as used in the [General Statutes 17-43a] refers to the restoration of a parent to his or her former constructive and useful role as a parent." In Re Migdalia M.,6 Conn. App. 194, 203 (1986). The court finds that Dorothy has not achieved such degree of personal rehabilitation, and that this condition has existed for more than one year.
Mother has done virtually nothing over the past two years to make it possible to return Christopher to her care and to assume a constructive, meaningful role in the life of the child. Rather than take advantage of the vocational training program established for her by DCYS, rather than maintain contact with and attempt to regain custody of her son, mother abruptly left Connecticut, and abandoned Christopher, in December, 1988 and moved to New York to "get her life together". While she participated in the program offered to her by United Services, that participation can only be classified as minimal. She voluntarily terminated her individual counseling sessions and demonstrated no improvement in developing parenting skills over three months of intensive involvement with the Young Parents Group. She has not even maintained a reasonable amount of contact with her child. Indeed, she has not seen him at all since August, 1990. Additionally, mother has been involved in both domestic violence and with illegal drugs within the past year.
The lack of interest in a commitment to this child by mother over the past two years is clearly predictive of the future. The child needs a permanent placement in a loving, nurturing home. That is not forthcoming from his mother who is more interested in getting her life together than making a home for and taking care of her son.
The totality of the evidence clearly and convincingly does not CT Page 1729 encourage or lead the court to believe that within a reasonable time mother could assume a responsible position in the life of Christopher, considering the age an the needs of the child. Christopher is three years old and is already in need of counseling and assistance to deal with his delayed speech and interactive skills. To require him to wait any longer for permanency will clearly be detrimental to his well-being.
The court finds that the petitioner has proven, by clear and convincing evidence, the ground of failure to rehabilitate as to the mother. The court finds that the ground of failure to rehabilitate is inapplicable to the putative fathers since neither putative father has ever had the child in his care or custody. Therefore this ground is dismissed as to Danny C. and Bruce P.
Pursuant to In Re Shavoughn K., 13 Conn. App. 91, 98 (1987), the court's required findings as to the six factors listed in Sec. 17-43a(d) as of December 14, 1990, the date of the amended petition, are as follows:
 (1). DCYS provided mother with vocational training, referrals for counseling and parenting classes, and encouraged her visitation with Christopher. Mother was specifically referred to and enrolled in programs provided by United Services of Willimantic. She did not follow through with service agreements entered into with DCYS, especially with respect to visitation. The United Services Young Parents Group offered mother transportation to visit with Christopher but mother refused this service.
 (2). Mother attended and participated in a court ordered psychological evaluation. No other court orders were entered.
 (3). The child has no emotional ties with his mother. He is bonded with and has close ties with his foster mother.
 (4). Christopher is three years of age with a birth date of December 21, 1987.
 (5). Mother has not made any substantial efforts to change her conditions or circumstances to make it in the best interest of the child to be returned to her. Her visits with the child have been so minimal as to be meaningless. She has not followed through with service agreements or counseling services offered to her.
 (6). Mother has not been prevented by anyone from maintaining a meaningful relationship with her son. Her economic circumstances were not a substantial factor in failing to visit with Christopher.
CT Page 1730
DISPOSITION — on facts as of January 4, 1990.
Having found proven by clear and convincing evidence the grounds of abandonment and no on-going parent child relationship as to all three respondents, as well as the ground of failure to rehabilitate as to the respondent mother, the court is next obligated to determine what is in the best interest of the child.
Christopher is a three year old child who has been in foster care for most of his life. He does not have positive memories or ties to or with his parents: he is bonded with and to his foster mother. The child's parents have abandoned him, as that term is defined by statute, and clearly there is no on-going parent child relationship in existence between Christopher and his mother or putative fathers. It would be unreasonable, and not at all in his best interest, to require him to wait any longer for parents who have had little or nothing to do with him in the past and are unlikely to have anything to do with him in the foreseeable future.
Children need permanent, safe, secure and nurturing homes and families in order to maximize their potential social and emotional development. Christopher has never really known his parents and they have chosen not to know him. He needs to belong to and be a part of a family, not merely a temporary guest; never knowing if or when his mother may chose to visit or become a meaningful part of his life.
Dr. Mantell indicated that removal of the child from his foster mother, to whom he is bonded and who is an adoptive resource, would be traumatic and harmful to the child and would cause him to regress. For these reasons the court finds it to be in the best interest of this child to terminate the parental rights of his mother and putative fathers so that Christopher may be free for adoption by those who will love and care for him.
Before entering an order of termination, however, the court must consider the six factors set forth in subsection (d) of Section 17-43a of the Connecticut General Statutes, as of the date of disposition, January 4, 1991.
 (1). DCYS provided mother with vocational training, referrals for counseling and parenting classes, and encouraged her visitation with Christopher. Mother was specifically referred to and enrolled in programs provided by United Services of Willimantic. She did not follow through with service agreements entered into with DCYS, especially with respect to visitation. The United Services Young Parents Group offered mother transportation to visit with Christopher but mother refused this service. No services were offered to the respondent putative fathers as their whereabouts have been unknown.
CT Page 1731
 (2). Mother attended and participated in a court ordered psychological evaluation. No court orders were entered as to the respondent putative fathers.
 (3). The child has no emotional ties with his mother or either putative father. He is bonded with and has close ties with his foster mother.
 (4). Christopher is three years of age with a birth date of December 21, 1987.
 (5). Mother has not made any substantial efforts to change her conditions or circumstances to make it in the best interest of the child to be returned to her. Her visits with the child have been minimal, at best, and she has not seen Christopher since August, 1990. She has not followed through with service agreements or the counseling services offered to her. She has been involved in instances of domestic violence and with illegal drugs during the past year. Neither putative father has made any effort to reunite with the child, visited with Christopher or been in contact with DCYS.
 (6). Neither mother nor either putative father has been prevented by anyone from maintaining a meaningful relationship with Christopher. Economic circumstances were not a factor.
JUDGEMENT
Having considered the foregoing, it is found by clear and convincing evidence to be in the best interests of Christopher that the parental rights of his mother and putative fathers be terminated so that he may be raised in a permanent, secure and nurturing environment as an adopted child.
It is therefore ORDERED that the parental rights of Danny C., Bruce P. and Dorothy C. are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgement a report as to progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
Dated at Montville this 5th day of February, 1991.
TERENCE A. SULLIVAN, JUDGE CT Page 1732